UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

SEBASTIAN ARBELAEZ, LUZ ARBELAEZ, DEBORAH
ARBELAEZ, and PABLO ARBELAEZ,

                              Plaintiffs,

      -against-

THE CITY OF NEW YORK, a municipal entity; New
York City Police Officers Detective DORIS LOPEZ
(Shield # 487); Police Officer RYAN BOYLAN; Detective
MACK LIPINSKI; Detective MARK O'CONNELL;
Sergeant BRIAN WINROW; Lieutenant EMILE
PROVENCHER;   Confidential   Informant
RICHARD/RACHEL ROE; and "JOHN and/or JANE
DOES" Nos. 1, 2, 3, etc. (whose identities are unknown but
who are known to be personnel of the New York City
Police Department), all of whom are sued individually and
in their official capacities,

                             Defendants.
-------------------------------------------------------------------- X

Docket No. 17-CV-06543
(RJS)

**FIRST AMENDED
COMPLAINT**

**JURY TRIAL**

       Plaintiffs SEBASTIAN ARBELAEZ, LUZ ARBELAEZ, DEBORAH ARBELAEZ, and

PABLO ARBELAEZ ("PLAINTIFFS"), by their attorneys, Beldock Levine & Hoffman LLP, as

and for their First Amended Complaint against the defendants named above allege as follows:

#### PRELIMINARY STATEMENT

       1.    This civil rights action seeks redress under 42 U.S.C. § 1983 for injuries

PLAINTIFFS sustained from the unconstitutional conduct of defendants THE CITY OF NEW

YORK, Confidential Informant RICHARD/RACHEL ROE, and New York City Police

Department ("NYPD") police officers DORIS LOPEZ (Shield # 487), RYAN BOYLAN,

MACK LIPINSKI, MARK O'CONNELL, Sgt. BRIAN WINROW, Lt. EMILE PROVENCHER, and "JOHN and/or JANE DOES" Nos. 1, 2, 3, etc.

2.      In May 2015, the Individual NYPD Defendants were months into an investigation of a small, but notorious, gang that was flooding PLAINTIFFS' Fordham neighborhood in the Bronx with drugs and violence. In particular, the Individual NYPD Defendants were investigating two known gang members who were selling drugs out of an apartment on the floor above LUZ ARBELAEZ's apartment.  Although the Individual NYPD Defendants had no reasonable basis to believe PLAINTIFFS were involved in the second floor drug activities, they unlawfully targeted PLAINTIFFS' home to be raided for the improper purposes of coercing information and to retaliate against PLAINTIFFS for their complaints about police officer misconduct.

3.      To carry out their plan, the Individual NYPD Defendants enlisted C.I. ROE, fabricated evidence of two controlled drug buys, and perjured themselves on paper and before a court to obtain a search warrant for the LUZ ARBELAEZ's apartment.  Armed with their improperly obtained warrant, the Individual NYPD Defendants burst into PLAINTIFFS' apartment early in the morning on May 29, 2015, brandishing guns and yelling for everyone to get on the floor.  The police officers then unlawfully detained and interrogated PLAINTIFFS while destructively searching their apartment.  Even though nothing illegal was found, and there was no reasonable suspicion or probable cause to believe that PLAINTIFFS were engaged in any illegal activity, the police officers falsely arrested SEBASTIAN, LUZ, and PABLO ARBELAEZ and falsely charged them with drug related offenses.

4.      As a result of the Individual NYPD Defendants' false and unlawful conduct, LUZ ARBELAEZ was imprisoned for approximately five hours, SEBASTIAN ARBELAEZ and

PABLO ARBELAEZ were imprisoned for approximately twenty (20) hours, and DEBORAH ARBELAEZ was held in custody for approximately two hours.  Plaintiffs SEBASTIAN, LUZ, and PABLO ARBELAEZ were additionally forced to return to Bronx Criminal Court approximately ten (10) times before the baseless criminal charges against them were finally dismissed.

5.      PLAINTIFFS seek (i) compensatory damages for loss of liberty, psychological and emotional distress, and other injuries caused by the illegal and unconstitutional actions of the defendants; (ii) punitive damages to deter such intentional or reckless deviations from well-settled constitutional law; (iii) costs and attorneys' fees; (iv) and such other and further relief as this Court deems equitable and just.

## JURISDICTION

6.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), as this action seeks redress for the violation of PLAINTIFFS' constitutional and civil rights.

7.      Supplemental jurisdiction is conferred upon this Court by 28 U.S.C. § 1367(a) over any and all state law claims that are so related to the federal claims that they form part of the same case or controversy.

## VENUE

8.      Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which the events giving rise to PLAINTIFFS' claims took place.

**JURY DEMAND**

9.      PLAINTIFFS demand a trial by jury in this action on each and every one of their claims for which jury trial is legally available.

**THE PARTIES**

10.     Plaintiff SEBASTIAN ARBELAEZ ("SEBASTIAN"), a citizen of the United States, is and was at all times relevant to this complaint a resident of Bronx County, City and State of New York.

11.     Plaintiff LUZ ARBELAEZ ("LUZ"), a citizen of the United States, is and was at all times relevant to this complaint a resident of Bronx County, City and State of New York.

12.     Plaintiff DEBORAH ARBELAEZ ("DEBORAH"), a citizen of the United States, is and was at all times relevant to this complaint a resident of Bronx County, City and State of New York.

13.     Plaintiff PABLO ARBELAEZ ("PABLO"), a citizen of the United States, is and was at all times relevant to this complaint a resident of Bronx County, City and State of New York.

14.     Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York.

15.     The CITY is authorized by law to maintain a police department, and does maintain the NYPD which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers.

16.     Defendant police officers Detective DORIS LOPEZ ("LOPEZ") (Shield # 487), RYAN BOYLAN ("BOYLAN"), MACK LIPINSKI ("LIPINSKI"), MARK O'CONNELL

("O'CONNELL"), BRIAN WINROW ("WINROW"), EMILE PROVENCHER ("PROVENCHER"), and Police Officers "JOHN and/or JANE DOES" Nos. 1, 2, 3, etc. ("DOES") (collectively, the "Individual NYPD Defendants") are NYPD police officers who: unlawfully detained and frisked PLAINTIFFS without suspicion of any illegal activity; lodged false criminal charges against plaintiffs LUZ, SEBASTIAN and PABLO; and caused SEBASTIAN and PABLO to be maliciously prosecuted.

17.    Defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES acted under color of state law in the course and scope of their duties and/or functions as agents, employees, and/or officers of the CITY and/or the NYPD.

18.    At the times relevant herein, defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES violated clearly established rights and standards under the Fourth and Fourteenth Amendments to the United States Constitution and under equivalent New York State constitutional provisions, of which reasonable police officers in their respective circumstances would have known.

19.    Defendant Confidential Informant RICHARD/RACHEL ROE ("C.I. ROE") is, upon information and belief, a citizen and resident of the State of New York.  At the time of the investigation of PLAINTIFFS' apartment, C.I. ROE was a citizen and resident of the State of New York.  His/her activities referenced in this Amended Complaint took place within the State of New York.

### COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW

20.    Plaintiffs' counsel filed Notices of Claim on behalf of PLAINTIFFS SEBASTIAN, LUZ, and PABLO upon the CITY on December 22, 2016, within ninety days of the December 4, 2014 dismissal of PLAINTIFF's criminal charges.

21.     More than thirty days have elapsed since PLAINTIFFS SEBASTIAN, LUZ, and PABLO served their Notices of Claim and the CITY has not offered adjustment or payment thereof.

22.     This action is filed within one year and ninety days of the events giving rise to PLAINTIFFS SEBASTIAN's, LUZ's, and PABLO's state law claims.

### STATEMENT OF FACTS

**Plaintiffs' Webster Avenue Apartment**

23.     LUZ ARBELAEZ resides in a three-bedroom apartment in the vicinity of 188th Street and Webster Avenue ("the Webster Avenue Apartment"), in the Bronx, New York, where she has lived for over twenty-three years.

24.     In and about May, 2015, three of LUZ ARBELAEZ's children were staying with her and looking after her because she was debilitated from having been hit by a car a few months earlier

25.     Plaintiff LUZ ARBELAEZ occupied a bedroom, and continues to occupy a bedroom at the Webster Avenue Apartment.

26.     In and about May, 2015, LUZ ARBELAEZ's sons, SEBASTIAN and PABLO, occupied a second bedroom at the Webster Avenue Apartment.  At that time, SEBASTIAN was working at the W Union Square Hotel and PABLO was home for summer break from studying at the State University of New York, Purchase College and working at a Bose retail store.  LUZ ARBELAEZ's daughter, DEBORAH ARBELAEZ, who was then working at the Club Quarters Hotel in midtown Manhattan, occupied a third bedroom at the Webster Avenue Apartment.

27.     Manuel Arbelaez, another one of LUZ ARBELAEZ's sons, who was living in Manhattan and studying at LaGuardia Community College at the time, would also stay at the Webster Avenue Apartment from time to time to help take care of his mother.

## The Webster Avenue Neighborhood

28.     In and about May of 2015, a gang of young men and women, who referred to themselves as "YNR," were distributing large quantities of crack and heroin in the vicinity of 188th Street and Webster Avenue (the "Webster Avenue Neighborhood").

29.     Members of YNR brazenly defied the NYPD and publicized their drug activities by posting videos, pictures, and messages on social media, including Youtube and Instagram.

30.     Upon information and belief, members of YNR were responsible for numerous acts of violence in the Webster Avenue Neighborhood, including shootouts with rival gang members.

31.     Upon information and belief, Rashod Lewis and Carlos Titen were prominent members of the YNR gang.

32.      Mr. Lewis and Mr. Titen occupied an apartment (the "Second Floor Webster Avenue Apartment") on the floor above the LUZ ARBELAEZ's apartment.

33.     Rashod Lewis is a black male.  Upon information and belief, in and about May, 2015, Mr. Lewis was approximately 5 feet, 5 inches, tall and weighed approximately 140 pounds.

34.     Carlos Titen is a black, Afro-Dominican male.  Upon information and belief, in and about May, 2015, Mr. Titen was approximately 5 feet, 10 inches tall, weighed approximately 140 pounds, and had his hair in an "afro" hairstyle.

35.     Upon information and belief, Mr. Lewis and Mr. Titen sold drugs out of the Second Floor Webster Avenue Apartment and used the apartment as a YNR "stash" house to store drugs and deadly weapons.

36.     Upon information and belief, in the months leading up to May 2015, members of the NYPD, including the Individual NYPD Defendants, had been conducting an investigation into YNR drug activities and acts of violence in the Webster Avenue Neighborhood.

37.     Upon information and belief, through their investigation of YNR gang related activities, members of the NYPD, including the Individual NYPD Defendants, were aware of Mr. Lewis's and Mr. Titen's identities, their involvement in YNR, and of their drug related activities at the Second Floor Webster Avenue Apartment.

38.     Upon information and belief, up to and including May 2015, members of the NYPD, including the Individual NYPD Defendants, had raided the Second Floor Webster Avenue Apartment and arrested Mr. Lewis and Mr. Titen several times.

39.     Upon information and belief, members of the NYPD, including the the Individual NYPD Defendants, had obtained search warrants to conduct the raids on the Second Floor Webster Avenue Apartment by using C.I. ROE to perform controlled buys of drugs from YNR members, including Rashod Lewis and Carlos Titen.

**The NYPD Targets the Arbelaez Family**

40.     In and about May 2015, Manuel Arbelaez was visiting the Webster Avenue Apartment to help his siblings take care of LUZ ARBELAEZ.

41.     Manuel Arbelaez's hair was died blue at the time.

42.     On or about May 11, 2015, NYPD police officers arrested several children, and lined them up in front of the stoop of the Webster Avenue Apartment.

43.     Manuel and LUZ ARBELAEZ observed the arrest from the doorway to the Webster Avenue Apartment at the top of the stoop.

44.     One of the children had a broken wrist that was in a cast.

45.     When a police officer gratuitously started twisting the arm of the child with the broken wrist, causing him to scream in pain, Manuel and LUZ verbally protested the police officer's actions.

46.     The police officers screamed at Manuel and LUZ, in sum and substance, to mind their own business and not interfere.

47.     When Manuel and LUZ continued to verbally protest the police officers' actions, police officers threateningly charged up the stoop towards Manuel and LUZ, causing them to fear for their safety and retreat into their apartment.

48.     SEBASTIAN ARBELAEZ exited the apartment, told the police officers what they were doing was wrong, began filming their conduct with his cellphone, and told them he was going to complain.

49.     Police officers responded, "Do it!"

50.     SEBASTIAN called 311 to complain about the police officers' actions and use of excessive force.

51.     A 311 operator connected SEBASTIAN with NYPD Internal Affairs.

52.     Sebastian stated he wanted to file a complaint and was put on hold for a long time.   Eventually, a member of NYPD Internal Affairs took SEBASTIAN's complaint and contact information and told SEBASTIAN they would investigate the incident and get back to him.

53.     SEBASTIAN emailed the investigator the footage from the incident that he had recorded with his cellphone.

54.     SEBASTIAN never heard back from anyone in the NYPD regarding his complaint.

55.     During the same week, Manuel and LUZ ARBELAEZ were on the stoop in front of the Webster Avenue Apartment building when they observed a male and female police officer berating a young black child who was sitting on a bicycle on the sidewalk.

56.     The police officers ordered the child to get his bike off the sidewalk; when the child did not immediately comply, the male police officer, who was much larger than the child, tackled the child on his bike.

57.     The male police officer violently put the child in handcuffs and placed him in a police car while referring to the child as "just a street nigguh."

58.     Manuel and LUZ verbally protested the male police officer's actions.

59.     The male police officer rudely told Manuel and LUZ, in sum and substance, to mind their own business.

60.     The incident drew a crowd of onlookers who also verbally protested the police officer's actions.

61.     In the early morning hours of May 16, 2015, Manuel was standing on the sidewalk outside of the Webster Avenue Apartment building when he was hit in the foot by a ricocheting bullet fired from across Webster Avenue.

62.     Upon information and belief, the shooter was a member of a rival gang shooting at YNR gang members who were in the vicinity of the Webster Avenue Apartment building.

63.     Manuel was taken to a hospital in the Bronx where he was treated for his injury.

64.     While Manuel was recovering at the hospital, NYPD police officers showed up and began questioning Manuel.

65.     The police officers asked Manuel for information about the shooting and if he had problems with any persons or gangs in the neighborhood.

66.     Manuel explained to the police officers that he was not involved in any gang activities and that he believed he had not been the intended target of the shooting.

67.     The next day, after Manuel had been released from the hospital, Manuel observed NYPD police officers, including the 48th Precinct Conditions Officer, Lt. Taveras, harassing his brother, PABLO, in front of the Webster Avenue Apartment.

68.     The police officers were screaming at PABLO that he could not stand in front of his home; PABLO verbally protested the police officers' orders and stated that he had a right to stand in front of his home.

69.     One of the police officers threatened to hit PABLO with his nightstick.

70.     Manuel stepped between PABLO and the police officer and attempted to de-escalate the situation.

71.     The police officer violently shoved Manuel, who was on crutches, almost knocking him over.

72.     LUZ ARBELAEZ came outside and verbally protested the police officers' actions against her children.

73.     A crowd gathered as numerous police officers responded to the scene and neighborhood people stopped to protest the police officers' conduct.

74.     The police officers eventually began to retreat from the Webster Avenue Apartment building.

75.     As the police officers were preparing to retreat, Lieutenant Taveras pulled out his gun, pointed it directly at LUZ, and screamed, in sum and substance, that he knew who she was and identified LUZ's apartment number.  While continuing to point his gun at LUZ, Lieutenant Taveras shouted, in sum and substance, that LUZ was protecting hoodlums and that she was a criminal.

76.     A few hours later, police officers showed up at the Webster Avenue Apartment, asked for Manuel, and again demanded information about the shooting that had taken place the previous night.

77.     Manuel gave the police officers the same information he had given them the previous night.

78.     A day or two later, Manuel was at his home in Manhattan when he was again visited by police officers.

79.     The police officers presented Manuel with what they claimed was a medical release and said that they needed him to sign it.

80.     Manuel did not understand why the police would need his medical records and did not sign their papers.

81.     The police officers then told Manuel they needed him to sign a statement regarding the shooting.

82.     Manuel explained that he was afraid of signing their statement because he feared his family at the Webster Avenue Apartment would be retaliated against if he did.

83.     The police offices ignored Manuel's concerns and aggressively continued to demand that he sign their statement.

84.     Manuel did not comply with the police officers' demands.

85.     On or about May 20, 2015, shortly after the incident in which Lt. Taveras had warned LUZ that he knew where she lived and after Manuel had refused to sign the police officers' statement, the Individual NYPD Defendants formally opened an investigation into LUZ ARBELAEZ's apartment.

86.     Upon information and belief, the Individual NYPD Defendants opened the investigation for the purpose of unlawfully obtaining a search warrant to retaliate against the Arbelaez family for complaining about police officer misconduct and for the purpose of coercing Manuel into complying with their demand for a statement.

87.     The Individual NYPD Defendants falsely claimed in a complaint report that their investigation began after they had received information from C.I. ROE that a male black and male Hispanic were selling crack cocaine out of LUZ ARBELAEZ's apartment.  However, upon information and belief, the Individual NYPD Defendants actually had known for months that the crack cocaine was being sold out of the Second Floor Webster Avenue Apartment and that the male black and Hispanic selling it was Rashod Lewis and Carlos Titen.

<b>The Individual NYPD Defendants Unlawfully<br>Procure a Search Warrant For Luz Arbelaez's Apartment</b>

88.     Between May 19th and May 29th, 2015, Detective LOPEZ, and other Individual NYPD Defendants, falsely claimed to have performed "positive" controlled buys in which C.I. ROE allegedly bought crack cocaine from inside LUZ ARBELAEZ's apartment.

89.     Contrary to this false claim, upon information and belief, Detective LOPEZ and the Individual NYPD Defendants utilized C.I. ROE to perform controlled buys at the Second Floor Webster Avenue Apartment.

90.     For example, Detective LOPEZ falsely claimed that in the first alleged controlled buy, C.I. ROE bought crack cocaine at LUZ ARBELAEZ's apartment from a black male who

13

was approximately 5 feet 5 inches tall, weighed 140 pounds, and was purportedly known by C.I. ROE as "Shorty."

91.   Upon information and belief, Detective LOPEZ and the other Individual NYPD Defendants knew that the person allegedly known to C.I. ROE as "Shorty" fit the description of Rashod Lewis who they knew sold drugs out of the Second Floor Webster Avenue Apartment.

92.   Detective LOPEZ further falsely claimed that in a second alleged controlled buy, C.I. ROE bought crack cocaine in LUZ ARBELAEZ's apartment from a black male who was approximately 5 feet 10 inches tall, weighed 140 pounds, and was purportedly known by C.I. ROE as "Afro."

93.   Upon information and belief, Detective LOPEZ and the other Individual NYPD Defendants knew that the person allegedly known to C.I. ROE as "Afro" fit the description of Carlos Titen who they knew sold drugs out of the Second Floor Webster Avenue Apartment.

94.   Upon information and belief, on or about May 28, 2015, Detective LOPEZ made arrangements with C.I. ROE that, in return for money, C.I. ROE would falsely state to a Bronx County Assistant District Attorney ("BCADA") and a New York State Supreme Court Judge that he/she had performed two controlled buys at LUZ ARBELAEZ's apartment so that Detective LOPEZ could obtain a search warrant for that apartment.

95.   Upon information and belief, based on Detective LOPEZ's and C.I. ROE's knowingly false information, a BCADA drew up the affidavit required to obtain a search warrant to search LUZ ARBELAEZ's apartment.

96.   Upon information and belief, Detective LOPEZ and C.I. ROE then went before a judge of the New York State Supreme Court Judge where they falsely testified about the two controlled buys that they claimed had been conducted at LUZ ARBELAEZ's apartment.

97.     Upon information and belief, based on the knowingly false testimony provided by Detective LOPEZ and C.I. ROE, the judge issued a search warrant to search LUZ ARBELAEZ's apartment.

98.     Upon information and belief, armed with their unlawfully procured search warrant, the Individual NYPD Defendants prepared to invade the Arbelaez family home in retaliation for complaining about police officers and to coerce Manuel into signing a statement.

**The May 29, 2015 Raid of Luz Arbelaez's Apartment**

99.     In the early morning of May 29, 2015, police officers from, without limitation, the Bronx Narcotics Unit, forcibly entered with guns drawn and destructively and unreasonably searched PLAINTIFFS' Webster Avenue Apartment.  On information and belief, some of the Individual NYPD Defendants were among the police officers involved in this incident.

100.    The entry and search were without consent, probable cause, or other legal justification as to the PLAINTIFFS.

101.    On information and belief, the police had a warrant to enter and search the apartment.  On information and belief, the warrant to enter and search the apartment was unlawful.  On information and belief, any warrant that certain defendants may have had did not authorize their unlawful conduct with regard to the PLAINTIFFS.

102.    None of the PLAINTIFFS had committed any unlawful acts to justify the conduct of the Individual NYPD Defendants towards them.

103.    LUZ was sleeping in her bedroom when police officers burst into her room, pointing guns and flashlights at her, and yelling for her to "get the fuck on the floor."

104.    LUZ was extremely frightened by the police officers, became pale, began shaking with fear, and attempted to comply with the police officers' orders.

105.    The police officers screamed at LUZ to move faster.

106.    LUZ told the officers that she was moving as fast as she could and that she was suffering and having difficulties due to injuries she had suffered from being hit by a car.

107.    The police officers responded by violently grabbing LUZ by her arm and dragging her out of her bedroom and into the living room.

108.    The police officer dragging LUZ exclaimed, "Make way for the drug addict!"

109.    In the living room, the police officers roughly attempted to handcuff LUZ behind her back causing her severe pain because her arms had a limited range of motion due to the car accident she had been in.

110.    The police officers eventually used two sets of linked handcuffs to handcuff LUZ.

111.    LUZ was then made to sit on the living room couch.

112.    SEBASTIAN and PABLO were asleep in the second bedroom when they were awoken by loud banging and crashing sounds caused by police officers breaking into the Webster Avenue Apartment.

113.    SEBASTIAN and PABLO were extremely frightened and jumped out of their beds.

114.    Approximately four police officers violently burst into the room, pointing guns and flashlights at SEBASTIAN and PABLO, and screamed at them to "get on the fucking ground."

115.    On information and belief, one or more of the Individual NYPD Defendants were among these police officers.

116.    SEBASTIAN and PABLO complied with the police officers' command

16

117.    SEBASTIAN and PABLO were immediately arrested by being roughly handcuffed behind their backs while they lay face-down on the ground.

118.    Police officers then grabbed PABLO, lifted him off the floor, forced him into the living room, and made him sit on the couch.

119.    The police officers violently turned SEBASTIAN over and forced him against a bureau.

120.    One of the police officers asked where the "boy with the blue hair" was.

121.    SEBASTIAN responded, "Who, my brother?"

122.    The officer then asked SEBASTIAN if he knew why the police were at the apartment.

123.    SEBASTIAN asked the police officer what he meant.

124.    The police officer responded by demanding SEBASTIAN tell them where the drugs were.

125.    SEBASTIAN did not know what the police officer was talking about.

126.    Police officers then grabbed SEBASTIAN, lifted him off the floor, forced him into the living room, and made him sit on the couch.

127.    DEBORAH ARBELAEZ was sleeping in the third bedroom when two police officers burst into her room, pointing guns and flashlights at her, and yelling for her to "get the fuck on the floor."

128.    On information and belief, one or more of the Individual NYPD Defendants were among these police officers.

129.    DEBORAH, who was wearing only a tank-top at the time, was terrified by the police officers' violent entry and fell out of her bed and on to the floor.

130.    The police officers leered at DEBORAH and told her to "put on your fucking underwear."

131.    DEBORAH complied while crying uncontrollably.

132.    DEBORAH was then immediately arrested by being roughly handcuffed with her hands behind her back.

133.    DEBORAH asked the officers what was happening and if her family was all right.

134.    The police officers responded by demanding to know where drugs were.

135.    DEBORAH told the police officers she did not know what they were talking about.

136.    DEBORAH was then forced to go into the living room and made to sit on the couch with her mother and brothers.

137.    Police officers told PLAINTIFFS "now we can be nice."

138.    The police officers demanded that PLAINTIFFS tell them where the drugs were.

139.    PLAINTIFFS responded that they did not know what the police were talking about.

140.    The police threatened to start "breaking shit" if PLAINTIFFS did not tell them where the drugs were.

141.    PLAINTIFFS again told the police officers that they did not know what they were talking about.

142.    Police officers began to destructively search the apartment.

143.    While they destructively searched the apartment, the police officers made comments, such as "Who would live in a piece of shit house like this? You people live like pigs!"

144.    At one point, SEBASTIAN asked the police officers if they had a warrant.

145.    The police officers responded by telling SEBASTIAN to "Shut the fuck up!" We don't work on your time; we work on our time."

146.    Two of the police officers that had arrested DEBORAH smirked at her and asked her how it felt to sleep naked.

147.    One of the police officers told DEBORAH that she should find better company than the "trash" she was hanging out with.

148.    One of the police officers asked LUZ where her husband was and joked to another police officer that, "She must be the first whore in the neighborhood that doesn't have a husband."

149.    LUZ was terrified, upset, and visibly ill from the way the police officers were treating her and her family.

150.    LUZ ,visibly pale and shaking, feared she was undergoing an epileptic episode

151.    SEBASTIAN, also afraid his mother was going to have an epileptic seizure, told the police officers that LUZ needed her medicine.

152.    The police officers responded by laughing and asking if she needed her "methadone."

153.    Another police officer responded, "She's a crackhead, right?"

154.    SEBASTIAN told the police officers that his mother was epileptic and that he was afraid she was going to have a seizure.

155.    The police officers responded, "She can wait."

156.    One of the police officers eventually obtained LUZ's seizure medicine.

157.    Instead of giving the seizure medicine to LUZ, he placed it on the coffee table where LUZ, who was still handcuffed, was unable to reach it.

158.    The police officers continued to joke that LUZ looked like a drug addict while LUZ's children pleaded for the police officers to allow her to take her seizure medicine.

159.    LUZ began to shake so violently that she started falling off of the couch.

160.    One of the police officers said, "Better give the meth-head her medication."

161.    The police officers finally allowed LUZ to take her seizure medicine.

162.    Police officers took SEBASTIAN off of the couch and brought him into his bedroom.

163.    The bedroom had been ransacked.

164.    The police officers had removed PABLO's and SEBASTIAN's clothes from the closet and bureaus, piled them in the middle of the floor, and ruined them by pouring a box of cornstarch and a bottle of bleach over them.

165.    SEBASTIAN was then subjected to a strip search.

166.    SEBASTIAN was made to drop his underwear, squat and cough.

167.    Because there were no curtains on the window, anyone looking from outside the ground floor bedroom window was able to see SEBASTIAN being strip searched.

168.    After SEBASTIAN had been strip searched, Detective LOPEZ entered the bedroom, waved papers in his face, and told SEBASTIAN he must be the "troubled one."

169.    Detective LOPEZ told SEBASTIAN that he knew why the police were there – because they were selling drugs out of their apartment.

170.    Detective LOPEZ told SEBASTIAN that she had pictures and videos of drug buyers entering and leaving their apartment.

171.    SEABASTIAN told Detective LOPEZ that neither he nor anyone else in his family sold drugs.

172.    Detective LOPEZ showed SEBASTIAN pictures of various persons from the neighborhood, including Carlos Titen, and asked SEBASTIAN what information he had on those people.

173.    SEBASTIAN responded that he knew some of the people in the pictures from seeing them in the neighborhood or in the apartment building, but that he did not interact with any of them beyond saying "hello" or a superficial greeting.

174.    Detective LOPEZ asked SEBASTIAN if he had noticed that she was the only police officer of color at the apartment and claimed she wanted to help SEBASTIAN.

175.    Detective LOPEZ asked SEBASTIAN if he thought "the white boys give a fuck about you?"

176.    SEABASTIAN told Detective LOPEZ that neither he nor anyone else in his family sold drugs.

177.    Detective LOPEZ continued to question SEBASTIAN about drugs and people from the neighborhood.

178.    SEBASTIAN told Detective LOPEZ he did not know what she was talking about.

179.    The police officers eventually returned SEBASTIAN to the living room and made him sit on the couch.

180.    Police officers then took PABLO into the same bedroom and subjected him to a strip search.

181.    The police officers commanded PABLO to remove his shirt, drop his underpants, squat, and cough.

182.   PABLO ARBELAEZ complied with the police officers' orders.

183.   Because the police officers had ripped the curtains off of the windows while searching the bedroom, PABLO ARBELAEZ was visible to anyone looking from outside the ground floor bedroom window.

184.   Detective LOPEZ entered the bedroom and told PABLO they knew he had drugs and to tell them where the drugs were.

185.   PABLO told the Detective LOPEZ that he did not know what she was talking about.

186.   Detective LOPEZ told PABLO that she was his friend, that she looked just like him, and that she would help him if he told her where drugs were.

187.   Detective LOPEZ told PABLO that she knew he associated with drug dealers in the neighborhood.

188.   PABLO told Detective LOPEZ that his family did not sell drugs, that he worked and went to school, that he normally lived at his school at the State University of New York at Purchase, and that he was only home for a break.

189.   The police officers eventually returned PABLO to the living room and made him sit on the couch.

190.   Police officers then took LUZ into her bedroom and told her to put on pants.

191.   Detective LOPEZ demanded that LUZ tell her where drugs were.

192.   LUZ responded that she did not know anything about drugs and asked why the police had arrested her children.

193.   Detective LOPEZ responded that her children associated with bad people, but that she would help LUZ out if LUZ told her where she could find some drugs.

194.    LUZ told Detective LOPEZ that she did not know what she was talking about.

195.    The police officers eventually returned LUZ to the living room and made her sit on the couch.

196.    Police officers then took DEBORAH into her bedroom and began asking her questions.

197.    Detective LOPEZ told DEBORAH that she was there to help her and that DEBORAH should tell her where the drugs were.

198.    Detective LOPEZ told DEBORAH that she did not know who her brothers really were, that her family was bad, and demanded that she tell her where the drugs were.

199.    DEBORAH told Detective LOPEZ that she did not know what she talking about.

200.    The police officers eventually returned DEBORAH to the living room and made her sit on the couch.

201.    After having been held in custody for approximately two hours, on information and belief, one or more of the Individual NYPD Defendants removed the handcuffs off of DEBORAH ARBELAEZ.

202.    On information and belief, one or more of the Individual NYPD Defendants took LUZ, SEBASTIAN, and PABLO ARBELAEZ, still handcuffed, out of the apartment and confined them in a police van.

203.    On information and belief, one or more of the Individual NYPD Defendants drove the van containing LUZ, SEBASTIAN, and PABLO ARBELAEZ, while they were still handcuffed, to the locations of other raids, after which additional arrestees were put into the police vehicle with them.

204.    The van was driven very erratically.  Because they were not secured in the van and, being handcuffed, unable to secure themselves, LUZ, SEBASTIAN, and PABLO were violently jostled and thrown about for much of the time they were confined inside the police van.

205.    Because LUZ ARBELAEZ was sick, weak, and physically suffering from previously having been hit by a car SEBASTIAN and PABLO did their best to secure LUZ by sitting on either side of her.

206.    LUZ, SEBASTIAN, and PABLO were eventually taken to the NYPD's 48th Precinct.

207.    LUZ, SEBASTIAN, and PABLO were falsely charged with Criminal use of drug paraphernalia in the second degree (N.Y.P.L. 220.50 (03)) and Criminal possession of a controlled substance in the seventh degree (N.Y.P.L. 220.03).

208.    Detective LOPEZ falsely claimed that LUZ, SEBASTIAN, and PABLO ARBELAEZ were found to be in possession of a quantity of a controlled substance (cocaine) and a scale.

209.    Upon information and belief, no evidence of illegal activity was recovered as a result of the police officers destructive and unlawful search of the Webster Avenue Apartment.

210.    Upon information and belief, even though no evidence of illegal activity was recovered as a result of the police officers destructive and unlawful search of the Webster Avenue Apartment, the Individual NYPD Defendants falsely arrested and charged PLAINTIFFS to retaliate against PLAINTIFFS for their past complaints regarding the conduct of police officers and to maintain their CI's official reputation for providing "accurate information."

211.    LUZ, SEBASTIAN, and PABLO ARBELAEZ were searched, fingerprinted, photographed, and then confined to jail cells at the 48th precinct.

212.     After being confined at the 48th Precinct for several hours, LUZ was released from custody with a Desk Appearance Ticket.

213.     SEBASTIAN and PABLO were eventually transported from the 48th Precinct to Bronx Central Booking where they were further subjected to searches and processing.

214.     SEBASTIAN and PABLO were eventually arraigned and released after having spent approximately twenty (20) hours in custody.

**The Arrest and Conviction of Occupants of the Second Floor Webster Avenue Apartment**

215.     In and about November 2015, members of the NYPD, including, on information and belief, the Individual NYPD Defendants, obtained a search warrant for the Second Floor Webster Avenue Apartment.

216.     On or about November 13, 2015, the Second Floor Webster Avenue Apartment was raided, resulting in evidence of significant criminal activity being uncovered: 115 vials of crack cocaine, 51 glassine envelopes of heroin, a Mac-11 sub-machine gun with an extended magazine, and 21 rounds of 9 mm ammunition.

217.     On or about May 4, 2016, Rashod Lewis, Carlos Titen, and several other persons were charged in a federal indictment with Narcotics Conspiracy, Robbery Conspiracy, Murder During and in Relation to a Drug Trafficking Crime, and several other criminal acts.  According to the federal prosecutor, Rashod Lewis and Carlos Titen were part of a gang known as YNR that lived in the vicinity of 188th Street and Webster Avenue who "managed to bring large quantities of crack cocaine and heroin into its neighborhood and to inflict mindless and, ultimately, deadly violence on its community."[1]

---

[1] Press Release, United States Attorney's Office, Southern District of New York, Leader Of Violent Drug Crew Pleads Guilty To 2016 Murder of Nelson Dubon (June 29, 2017) (available at https://www.justice.gov/usao-sdny/pr/leader-violent-drug-crew-pleads-guilty-2016-murder-nelson-dubon).

218.    Rashod Lewis pled guilty to weapons charges and was sentenced to 360 months in prison.   He currently is appealing the length of his sentence.

219.    Carlos Titen pled guilty to narcotics conspiracy and is currently awaiting sentencing.

### Disposition of the Criminal Cases Against the Arbelaez Family

220.    As the criminal case against members of YNR and the occupants of the Second Floor Webster Avenue Apartment came to fruition, the prosecution against LUZ, SEBASTIAN, and PABLO ARBELAEZ for the false criminal charges the Individual NYPD Defendants had lodged against them lingered on.

221.    The criminal charges against LUZ were eventually dismissed pursuant to N.Y.C.P.L. 170.55 on October 4, 2016.

222.    The criminal charges against SEBASTIAN and PABLO were subsequently dismissed.

223.    At all times relevant herein, the Individual NYPD Defendants were engaged in a joint venture.  The Individual NYPD Defendants assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during the said events.

224.    Defendants' conduct caused PLAINTIFFS to suffer unlawful arrest, detention and imprisonment, loss of liberty, unreasonable search and seizure, damage or loss of property, emotional and psychological pain, embarrassment, humiliation, harm to their reputation, deprivation of other constitutional rights, and financial loss, including loss of income, legal fees, costs and expenses.

## FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983 – Violations of Fourth and Fourteenth Amendment Right)
### Against the Individual Defendants

225.    PLAINTIFFS repeat and re-allege each and every allegation above as if fully set forth herein.

226.    In committing the acts and omissions complained of herein, defendant C.I. ROE and the Individual NYPD Defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES acted under color of state law to deprive PLAINTIFFS of certain constitutionally protected rights under the Fourth and Fourteenth Amendments to the United States Constitution, including, but not limited to:

    a.   freedom from unreasonable search and seizure of their persons and property;

    b.   freedom from arrest without probable cause;

    c.   freedom from false imprisonment, that being wrongfully detained without good faith, reasonable suspicion or legal justification, of which wrongful detention PLAINTIFFS were aware and did not consent;

    d.   freedom from the lodging of false charges against them by police officers and prosecutors, including, on information and belief, by some or all of the Individual NYPD Defendants;

    e.   freedom from malicious prosecution by police officers and prosecutors, that being prosecution without probable cause that is instituted with malice and that ultimately terminated in PLAINTIFFS' favor;

    f.   freedom from abuse of process; and

    g.   freedom from deprivation of liberty without due process of law.

227.    In committing the acts and omissions complained of herein, defendant C.I. ROE and NYPD police officers LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES breached their affirmative duty to intervene to protect the

constitutional rights of citizens from infringement by other law enforcement officers in their presence.

228.    As a direct and proximate result of defendant C.I. ROE's and Individual NYPD Defendants LOPEZ's, BOYLAN's, LIPINSKI's, O'CONNELL's., WINROW's, PROVENCHER's, and DOES'deprivation of PLAINTIFFS' constitutional rights, PLAINTIFFS suffered the injuries and damages set forth above.

229.    The unlawful conduct of defendant C.I. ROE and Individual NYPD Defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

**SECOND CAUSE OF ACTION**
**(42 U.S.C. § 1983 Civil Rights Conspiracy)**
**Against the Individual Defendants**

230.    PLAINTIFFS repeat and re-allege each and every allegation above as if fully set forth herein.

231.    Individual NYPD Defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES, acting within the scope of their employment and under color of state law, and defendant C.I. ROE, agreed among themselves and with other individuals to act in concert in order to deprive PLAINTIFFS of their  clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law.

232.    In furtherance of the conspiracy C.I. ROE and the Individual NYPD Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

    a.   Falsely arresting and imprisoning PLAINTIFFS, in the absence of probable cause;

    b.   Fabricating inculpatory evidence in reports and communications with prosecutors, including the purportedly positive controlled buy drug sales that were allegedly conducted at PLAINTIFFS' apartment; and

    c.   Submission of false allegations in the search warrant affidavit and engaging in false testimony during the search warrant application hearing.

233.    The charges that PLAINTIFFS participated in positive controlled buy drug sales allegedly conducted at their apartment are false and the criminal charges lodged against them by the Individual NYPD Defendants have been dismissed in their entirety.

234.    As a direct and proximate result of the C.I. ROE's and the Individual NYPD Defendants' actions, PLAINTIFFS' home was wrongfully entered, searched, and damaged; and PLAINTIFFS were falsely arrested, maliciously prosecuted, and suffered the related damages and injuries set forth above.

### THIRD CAUSE OF ACTION
### (Violations of the New York State Constitution)
### Against the Individual NYPD Defendants

235.    PLAINTIFFS repeat and re-allege each and every allegation above as if fully set forth herein.

236.    Defendants' conduct breached the protections guaranteed to PLAINTIFFS by the New York State Constitution including, but not limited to, Article I, §§ 6 and 12, and including the following rights:

    a.   freedom from unreasonable search and seizure of their persons and property;

    b.   freedom from arrest without probable cause;

c.  freedom from false imprisonment, that being wrongfully detained without good faith, reasonable suspicion or legal justification, of which wrongful detention PLAINTIFFS were aware and did not consent;

d.  freedom from the lodging of false charges against them by police officers and prosecutors, including, on information and belief, by some or all of the Individual NYPD Defendants;

e.  freedom from malicious prosecution by police officers and prosecutors, that being prosecution without probable cause that is instituted with malice and that ultimately terminated in PLAINTIFFS' favor; and

f.  freedom from deprivation of liberty without due process of law.

237.   The deprivation of PLAINTIFFS' rights under the New York State Constitution resulted in the injuries and damages set forth above.

**<u>FOURTH CAUSE OF ACTION</u>**
**(False Imprisonment)**
**Against the Individual NYPD Defendants**

238.   PLAINTIFFS repeat and re-allege each and every allegation above as if fully set forth herein.

239.   Defendant C.I. ROE and Individual NYPD Defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES, through the foregoing acts, caused PLAINTIFFS to be wrongfully detained without good faith, reasonable suspicion, or legal justification, of which detention PLAINTIFFS were aware and to which they did not consent.

240.   Defendant C.I. ROE and Individual NYPD Defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES committed the foregoing acts intentionally, willfully, and with malicious disregard for PLAINTIFFS' rights and are therefore liable for punitive damages.

**FIFTH CAUSE OF ACTION**
(Malicious Prosecution)
**Against the Individual NYPD Defendants**

241.    PLAINTIFFS repeat and re-allege each and every allegation above as if fully set forth herein.

242.    Defendant C.I. ROE and Individual NYPD Defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES, through the foregoing acts, maliciously commenced a criminal proceeding against PLAINTIFFS SEBASTIAN ARBELAEZ and PABLO ARBELAEZ, which ended in their favor, without probable cause to believe PLAINTIFFS SEBASTIAN ARBELAEZ and PABLO ARBELAEZ were guilty of the crimes charged or any crimes.

243.    Defendant C.I. ROE and Individual NYPD Defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES committed the foregoing acts intentionally, willfully, and maliciously, and are therefore liable for punitive damages.

**SIXTH CAUSE OF ACTION**
(Assault and Battery)
**Against the Individual NYPD Defendants**

244.    PLAINTIFFS repeat and re-allege each and every allegation above as if fully set forth herein.

245.    Individual NYPD Defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES, without just cause, wilfully and maliciously used physical force against PLAINTIFFS causing them injury.

246.    Individual NYPD Defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES committed the foregoing acts intentionally, wilfully,

31

and with malicious disregard for PLAINTIFFS' rights, and are therefore liable for punitive damages.

## SEVENTH CAUSE OF ACTION
### (Trespass)
### Against the Individual NYPD Defendants

247.   PLAINTIFFS repeat and re-allege each and every allegation above as if fully set forth herein.

248.   On information and belief, the Individual NYPD Defendants, by their aforementioned acts, did intentionally, willfully, and knowingly enter the premises at the Webster Avenue Apartment on May 29, 2015.

249.   On information and belief, the Individual NYPD Defendants' entry on each date was wrongful in that it was without consent or legal justification.

250.   On information and belief, the Individual NYPD Defendants committed the foregoing acts intentionally, willfully and with malicious disregard for plaintiffs' rights.

251.   As a result, plaintiffs suffered the injuries and damages set forth above.

## EIGTH CAUSE OF ACTION
### (Infliction of Emotional Distress)
### Against the Individual NYPD Defendants

252.   PLAINTIFFS repeat and re-allege each and every allegation above as if fully set forth herein.

253.   Defendant C.I. ROE and Individual NYPD Defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES, through the foregoing acts, did commit extreme and outrageous conduct and thereby intentionally, recklessly, and/or

negligently caused PLAINTIFFS to experience severe mental and emotional distress, pain, suffering, and damage to name and reputation.

254.    Individual NYPD Defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES committed the foregoing acts intentionally, willfully, and with malicious disregard for PLAINTIFFS' rights and are therefore liable for punitive damages.

### NINTH CAUSE OF ACTION
### (Negligence of the Individual NYPD Defendants)
### Against the Individual NYPD Defendants

255.    PLAINTIFFS repeat and re-allege each and every allegation above as if fully set forth herein.

256.    On information and belief, the Individual NYPD Defendants, by their aforementioned acts, negligently failed to use due care in the performance of their duties in that they, among other negligent acts:

    a.   failed to perform their duties as a reasonably prudent and careful police officer or supervisor would have done under similar circumstances;

    b.   carelessly and recklessly entered PLAINTIFFS' home;

    c.   carelessly and recklessly seized and detained PLAINTIFFS;

    d.   carelessly and recklessly damaged PLAINTIFFS' property; and

    e.   carelessly and recklessly arrested and detained PLAINTIFFS without a warrant or probable cause.

257.    The negligent actions of Individual NYPD Defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES directly and proximately caused plaintiffs' injuries and damages set forth above.

33

**TENTH CAUSE OF ACTION**
(*Respondeat Superior*)
**Against Defendant CITY OF NEW YORK**

258.    PLAINTIFFS repeat and re-allege each and every allegation above as if fully set forth herein.

259.    At all relevant times, Defendant C.I. ROE and Individual NYPD Defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES were employees of the City and were acting within the scope of their employment.

260.    The CITY is therefore vicariously liable under the common law doctrine of *respondeat superior* for the actions of Defendant C.I. ROE and Individual NYPD Defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES set forth herein.

## DEMAND FOR RELIEF

**WHEREFORE**, PLAINTIFFS SEBASTIAN ARBELAEZ, LUZ ARBELAEZ, DEBORAR ARBELAEZ, and PABLO ARBELAEZ demand the following relief against the defendants, jointly and severally:

    (a)    compensatory damages in an amount just and reasonable and in conformity with the evidence at trial;

    (b)    punitive damages from defendant C.I. ROE and Individual NYPD Defendants LOPEZ, BOYLAN, LIPINSKI, O'CONNELL, WINROW, PROVENCHER, and DOES to the extent allowable by law;

    (c)    attorneys' fees;

    (d)    the costs and disbursements of this action;

    (e)    interest; and

    (f)    such other and further relief as this Court deems just and proper.

Dated: New York, New York
      April 16, 2018

BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, Suite 2600
New York, New York 10016
(212) 490-0400

  /s/Marc A. Cannan
Marc A. Cannan (MC0513)
*Attorneys for Plaintiffs Sebastian Arbelaez, Luz Arbelaez, Deborah Arbelaez, and Pablo Arbelaez*

35