# EXHIBIT A

*Transcript of March 13, 2015 Deposition of Detective Doris Lopez*

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3
      Docket No. 17-CV-06543(RJS)
 4    ------------------------------------------x
 5    SEBASTIAN ARBELAEZ, et al.
 6                           Plaintiffs,
 7         - against -
 8    THE CITY OF NEW YORK, et al.,
 9                           Defendants.
10    ------------------------------------------x
      (FULL CAPTION ON THE FOLLOWING PAGE)
11
                           99 Park Avenue
12                         New York, New York
13                         March 13, 2019
                           10:27 a.m.
14
15       * CONFIDENTIAL - ATTORNEYS' EYES ONLY *
16
17         VIDEOTAPED DEPOSITION of DORIS LOPEZ,
18    a Defendant in the above-entitled action,
19    held at the aforementioned time and place,
20    taken before Ashley Shugar, a Shorthand
21    Reporter and Notary Public of the State of
22    New York, pursuant to the Federal Rules of
23    Civil Procedure, Order and stipulations
24    between Counsel.
25                   *     *     *
```

Page 2

1
2 (FULL CAPTION FROM THE PRIOR PAGE)
3
4 UNITED STATES DISTRICT COURT
  SOUTHERN DISTRICT OF NEW YORK
5
  Docket No. 17-CV-06543(RJS)
6 ------------------------------------x
7 SEBASTIAN ARBELAEZ, LUZ ARBELAEZ, DEBORAH
  ARBELAEZ, and PABLO ARBELAEZ,
8
          Plaintiffs,
9
      - against -
10
  THE CITY OF NEW YORK, a municipal entity,
11 New York City Police Officers Detective
  DORIS LOPEZ (Shield #487); Police Officer
12 RYAN BOYLAN; Detective MACK LIPINSKI;
  Detective MARK O'CONNELL; Sergeant BRIAN
13 WINROW; Lieutenant EMILE PROVENCHER;
  Confidential Informant RICHARD/RACHEL ROE;
14 and "JOHN and/or JANE DOES" Nos. 1, 2, 3,
  etc. (whose identities are unknown but who
15 are known to be personnel of the New York
  City Police Department), all of whom are
16 sued individually and in their official
  capacities,
17
          Defendants.
18
  ------------------------------------x
19
20
21
22
23
24
25

Page 3

1
2 A P P E A R A N C E S:
3
4 BELDOCK LEVINE & HOFFMAN LLP
5 Attorneys for Plaintiffs
6     99 Park Avenue, 26th Floor
7     New York, New York 10016
8 BY: MARC A. CANNAN, ESQ.
9     mcannan@blhny.com
10 FILE: 8240.01
11
12
13 NEW YORK CITY LAW DEPARTMENT
14 OFFICE OF THE CORPORATION COUNSEL
15 Attorneys for Defendants
16    100 Church Street
17    New York, New York 10007
18 BY: DANIEL SAAVEDRA, ESQ.
19    dsaavedr@law.nyc.gov
20    DEBRA M. MARCH, ESQ.
21
22
23 A L S O   P R E S E N T:
24    JONATHAN POPHAM, Videographer
25        *    *    *

Page 4

1
2          S T I P U L A T I O N S
3
4      IT IS HEREBY STIPULATED AND AGREED,
5 by and among counsel for the respective
6 parties hereto, that the filing, sealing
7 and certification of the within deposition
8 shall be and the same are hereby waived;
9      IT IS FURTHER STIPULATED AND AGREED
10 that all objections, except as to form of
11 the question, shall be reserved to the time
12 of the trial;
13     IT IS FURTHER STIPULATED AND AGREED
14 that the within deposition may be signed
15 before any Notary Public with the same
16 force and effect as if signed and sworn to
17 before the Court.
18            *    *    *
19
20
21
22
23
24
25

Page 5

1           D. LOPEZ - CONFIDENTIAL
2           THE VIDEOGRAPHER:  Good
3       morning.
4           We are going on the record at
5       10:27 a.m. on March 13th, 2019.
6           Please note that the
7       microphones are sensitive and may
8       pick up whispering, private
9       conversations and cell- -- cellular
10      interference.
11          Please turn off all cell phones
12      or place them away from the
13      microphones as they can interfere
14      with the deposition audio.
15          Audio and video recording will
16      continue until all parties agree to
17      go off the record.
18          This is Media Number One of the
19      video deposition of Doris Lopez,
20      taken by counsel for Plaintiff, in
21      the matter of Sebastian Arbelaez, et
22      al. versus The City of New York, et
23      al. filed in the United States
24      District Court for the Southern
25      District of New York, Case Number

2 (Pages 2 - 5)

Page 22

1  D. LOPEZ - CONFIDENTIAL
2 assignment after the 30th Precinct?
3   A.  Bronx narcotics.
4   Q.  Bronx narcotics.
5       And when you say Bronx
6 narcotics, did you have a particular
7 assignment within Bronx narcotics?
8   A.  Yes, I was assigned the 48
9 Module.
10  Q.  The 48?
11  A.  Yes.
12  Q.  Okay. And what is the 48
13 Module?
14  A.  It's -- it's like the precinct,
15 but it's only narcotics. The team is
16 assigned to one specific location which
17 will be the 48.
18  Q.  Okay. And do you --
19      Are your offices in the 48th
20 Precinct or do you have offices separately?
21  A.  Separately.
22  Q.  Okay. So you have a --
23      Well, strike that.
24      Okay. And when you went from
25 being a conditions officer to a narcotics

Page 23

1  D. LOPEZ - CONFIDENTIAL
2 officer, did you receive any special
3 training to become a narcotics officer?
4   A.  Yes, sir.
5   Q.  And that would've been in 2011
6 roughly?
7   A.  August 2011, yes.
8   Q.  Okay. And what kind of
9 training did you receive before becoming a
10 narcotics officer?
11  A.  How to identify drugs, how to
12 execute a search warrant, how to
13 investigate kites at that moment.
14  Q.  Okay. And generally, the
15 training for how to execute a search
16 warrant, what do you recall that consisting
17 of?
18  A.  There was a cycle that will
19 show you how to break doors literally --
20  Q.  Okay.
21  A.  -- get into the apartment to
22 execute a search warrant. That's how.
23  Q.  That sounds like fun training.
24      And what about the training for
25 investigating kites? Generally, what kind

Page 24

1  D. LOPEZ - CONFIDENTIAL
2 of training did you receive in regard to
3 that?
4   A.  How to use the database, NYPD
5 database --
6   Q.  Okay.
7   A.  -- to obtain information.
8   Q.  And I guess I should clarify,
9 what is a kite?
10  A.  It's a complaint generated
11 for nar- -- especially for narcotics.
12  Q.  Okay. And how are kites
13 generated in narcotics? As in, do you have
14 people who call in complaints or how would
15 they be generated?
16  A.  All the above.
17  Q.  All the above? Okay.
18  A.  Yes.
19  Q.  So just give me some examples.
20  A.  911 calls --
21  Q.  Okay.
22  A.  -- 311 calls --
23  Q.  Uh-huh.
24  A.  -- CI information --
25  Q.  Okay.

Page 25

1  D. LOPEZ - CONFIDENTIAL
2   A.  -- anonymous calls.
3   Q.  Okay. Today I'm gonna be
4 showing you several documents having to do
5 with the May 29th, 2015, raid or the
6 investigation leading up to it.
7       But I'd like to get your
8 general recollection of that event first.
9 So if you could just give me a general
10 narrative of what you recall about, you
11 know, what started -- caused you to start
12 investigating 240 -- 2416 Webster Avenue,
13 you know, going through the raid.
14      MR. SAAVEDRA: Objection to
15    form.
16      You can answer.
17      THE WITNESS: CI information
18    that stated Apartment 1 Sam on 2416
19    was selling drugs. Conduct the
20    investigation; a database, NYPD
21    checks; develop two control buys with
22    the CI. A judge in the Bronx gave us
23    a search warrant. We executed the
24    search warrant with positive results.
25

7 (Pages 22 - 25)

Page 154

```
 1        D. LOPEZ - CONFIDENTIAL
 2   to those individuals in that apartment.
 3       Q.   Well, is it --
 4            Did the narcotic sale -- sales
 5   occur in the apartment or was it just the
 6   individual was arrested for narcotics
 7   somewhere?
 8            MR. SAAVEDRA:  Objection to
 9       form.
10            You can answer.
11            THE WITNESS:  The Triple I
12       state the arrests of what the charges
13       were made on the individual.
14   BY MR. CANNAN:
15       Q.   Uh-huh.
16       A.   If it was for the possession or
17   sale, I wouldn't know the details where it
18   was sell or where it was.
19            When I run the Triple I based
20   on that location, it's -- there was a
21   history of narcotics for that apartment.
22   Those individuals were in a history of
23   narcotics.
24            I don't know if I'm making
25   myself clear.
```

Page 155

```
 1        D. LOPEZ - CONFIDENTIAL
 2       Q.   The individuals or the
 3   apartment, that's what I'm trying to figure
 4   out?
 5       A.   Both.
 6       Q.   Both?
 7       A.   Yes.
 8       Q.   Okay.
 9       A.   'Cause if -- on the control
10   buys to that location, they're selling
11   narcotics.  And, now, the individuals in --
12   living in that location have a narcotic
13   history.
14       Q.   And you're saying the -- the
15   narcotic history of selling drugs out of
16   that apartment?
17       A.   Correct, sir.
18       Q.   Okay.  Now, if this shooting
19   had occurred just days before you started
20   your investigation, that would be relevant,
21   correct?
22            MR. SAAVEDRA:  Objection to
23       form.
24            You can answer.
25            THE WITNESS:  If the shooting
```

Page 156

```
 1        D. LOPEZ - CONFIDENTIAL
 2       happened inside the apartment or at
 3       the door of the apartment, yes.
 4   BY MR. CANNAN:
 5       Q.   Okay.  And did you say you
 6   would have requested the 61?
 7            MR. SAAVEDRA:  Objection to
 8       form.
 9            You can answer.
10            THE WITNESS:  I said I would
11       view the 61.
12   BY MR. CANNAN:
13       Q.   Oh, you would've viewed the 61?
14   Okay.
15       A.   'Cause as my DD-5 stated here,
16   it says "victim of a shooting."
17       Q.   Uh-huh.
18       A.   My recollection -- well, that
19   reading that state- -- you know, will
20   remind me that I had viewed the 61 and
21   that's why I know he was a victim of a
22   shooting.
23       Q.   Uh-huh.
24       A.   Otherwise, I would've noted it
25   as the perpetrator of a shooting.
```

Page 157

```
 1        D. LOPEZ - CONFIDENTIAL
 2       Q.   Right.  Okay.
 3            And do you recall doing any
 4   other investigation of that shooting?
 5       A.   No, sir.
 6       Q.   Wouldn't you have wanted to
 7   talk to the police officers investigating
 8   the shooting?
 9            MR. SAAVEDRA:  Objection to
10       form.
11            You can answer.
12            THE WITNESS:  It depends on the
13       situation.
14   BY MR. CANNAN:
15       Q.   Okay.  Well --
16       A.   Like I said and I mentioned it,
17   if the shooting happened and it's on my --
18   the apartment that I'm investigating, yes.
19       Q.   Okay.
20       A.   But if the shooting didn't
21   happen inside the building at all, no.
22       Q.   Okay.  So right at the time
23   your CI allegedly tells you there's drug
24   sales going on in this apartment, there's a
25   shooting in front of the apartment in which
```

Page 158

```
 1       D. LOPEZ - CONFIDENTIAL
 2   one of the occupants of the apartment is
 3   hit by a bullet.
 4       Would you be interested in
 5   investigating that further?
 6       MR. SAAVEDRA: Objection to
 7   form.
 8       You can answer.
 9       THE WITNESS: Yes and no.
10       As my knowledge, I was assigned
11   to the 48, pretty much know the
12   narcotics history within the
13   location. That street was full,
14   always, of narcotic. You have a park
15   also next door. So it wasn't --
16       It depends on the situation,
17   again.
18       If it would've happened inside
19   the apartment, yes, I would have
20   probably proceed more of going and
21   investigating it.
22  BY MR. CANNAN:
23  Q.  But even though it's an
24  occutant of the -- occupant of the
25  apartment being shot right in front of the
```

Page 159

```
 1       D. LOPEZ - CONFIDENTIAL
 2  apartment?
 3       MR. SAAVEDRA: Objection.
 4       You can answer.
 5       THE WITNESS: Well, there's so
 6   many --
 7       When Accurint shows you that
 8   this person might become living in
 9   this apartment, might be living,
10   might not be living. It's just
11   mentioning that the person lives
12   there.
13  BY MR. CANNAN:
14  Q.  Uh-huh.
15  A.  I know --
16  Q.  So that's something you might
17  want to investigate, right?
18  A.  Correct.
19       MR. SAAVEDRA: Objection to
20   form.
21       You can answer.
22       THE WITNESS: Yes.
23  BY MR. CANNAN:
24  Q.  Maybe talk to the detectives
25  who were doing that investigation?
```

Page 160

```
 1       D. LOPEZ - CONFIDENTIAL
 2       MR. SAAVEDRA: Objection to
 3   form.
 4       You can answer.
 5       THE WITNESS: I don't remember
 6   if I did or not did -- or didn't do
 7   it.
 8  BY MR. CANNAN:
 9  Q.  Is that something the field
10  intelligence officer would've told you when
11  you were asking about this address, that
12  shooting?
13  A.  I don't remember when the
14  shooting happened.
15  Q.  Well, I'll tell you it happened
16  on May 16th, right before you started this
17  investigation.
18       And your DD-5, I forget if it
19  was May 19th or May 20th.
20       So that's just days, correct?
21  A.  Yes, sir.
22  Q.  Yeah.
23       But you have no recollection of
24  whether anybody told you -- an- -- what the
25  field intelligence officer told you
```

Page 161

```
 1       D. LOPEZ - CONFIDENTIAL
 2  anything, correct?
 3  A.  No, sir.
 4  Q.  You said you have a lot of
 5  experience with the drug activity going on
 6  in that block?
 7  A.  The whole 48.
 8  Q.  I'm sorry?
 9  A.  The whole 48.
10  Q.  The whole --
11  A.  I was --
12  Q.  -- 48?
13  A.  -- assigned to the 48 Module.
14  Q.  But even --
15       Wasn't that block --
16       Didn't -- didn't Webster Avenue
17  particularly have a lot of drug activity?
18  A.  Webster, Hughes, Crotona
19  Avenue --
20  Q.  And that --
21  A.  Crotona --
22  Q.  Crotona.
23  A.  -- Park.
24  Q.  Right.
25  A.  Everywhere.
```

41 (Pages 158 - 161)

Page 366

1       D. LOPEZ - CONFIDENTIAL
2        And you told me before you
3  never heard of YNR, correct?
4     A.   Correct.
5     Q.   So you never heard about
6  Kenneth Rudge being arrested?
7        MR. SAAVEDRA: Objection.
8        You can answer.
9        THE WITNESS: Heard?
10 BY MR. CANNAN:
11    Q.   Heard about --
12       Did you ever learn Kenneth
13 Rudge was arrested as a member of YNR?
14    A.   After the takedown, yes.
15    Q.   After the takedown?
16    A.   Uh-huh.
17    Q.   So you are aware --
18       You have heard about YNR then?
19    A.   But after the takedown. Not
20 when I --
21    Q.   Okay.
22    A.   -- was conducting my
23 investigation.
24    Q.   And not when you were part of
25 the 48th Module?

Page 367

1       D. LOPEZ - CONFIDENTIAL
2     A.   No.
3     Q.   Are you aware that YNR had been
4  operating in the vicinity of 180th Street
5  and Webster Avenue since 2- -- 2012?
6     A.   I don't remember I was aware.
7     Q.   So you might've been aware?
8     A.   Might.
9     Q.   That they were engaged in a
10 conspiracy to distribute crack cocaine and
11 heroin to addicts in that area?
12       MR. SAAVEDRA: Objection.
13       You can answer.
14       THE WITNESS: I don't remember,
15    sir.
16 BY MR. CANNAN:
17    Q.   And that despite their modest
18 size, they managed to bring large
19 quantities of crack cocaine and heroin into
20 its neighborhood?
21       MR. SAAVEDRA: Objection.
22 BY MR. CANNAN:
23    Q.   And to inflict and pointless
24 and ultimately deadly violence on this
25 community?

Page 368

1       D. LOPEZ - CONFIDENTIAL
2        MR. SAAVEDRA: Objection.
3        You can answer.
4        THE WITNESS: As being in the
5     48, that's every block.
6  BY MR. CANNAN:
7     Q.   And you --
8        But you weren't aware of this
9  gang operating on that block?
10    A.   The block, no. At that moment
11 of my investigation, no.
12    Q.   At all during your time at the
13 48th?
14    A.   After, yes.
15    Q.   When after?
16    A.   After I did my search warrant.
17    Q.   So between the end of May 2015
18 and the next year you learned that?
19    A.   Yes.
20    Q.   And did you ever learn about
21 Rashod Lewis being arrested as a member of
22 YNR?
23    A.   I don't remember the name.
24    Q.   Showing you Plaintiffs' 11,
25 he's the individual on the right-hand side.

Page 369

1       D. LOPEZ - CONFIDENTIAL
2     A.   The one with the cigarette?
3     Q.   The one who has kind of a smirk
4  on his face.
5        THE VIDEOGRAPHER: You're
6     blocking the --
7        MR. CANNAN: Sorry.
8        THE WITNESS: Here
9     (indicating)?
10 BY MR. CANNAN:
11    Q.   On your left. Sorry.
12    A.   Yeah, my left.
13    Q.   Okay.
14    A.   If you mean smirking --
15    Q.   Yeah.
16    A.   -- over here?
17    Q.   Yeah.
18    A.   I don't remember I seen his
19 picture prior of my investigation --
20    Q.   Uh-huh.
21    A.   -- but later on, yes.
22    Q.   Okay. And are you aware he's
23 now is serving 30 years in prison for
24 selling drugs and committing violence --
25       MR. SAAVEDRA: Objection.

93 (Pages 366 - 369)

Page 370

D. LOPEZ - CONFIDENTIAL

BY MR. CANNAN:
Q. -- in the neighborhood of 180th and Webster?
MR. SAAVEDRA: Objection. You can answer.
THE WITNESS: I don't know how long he's been serving.
BY MR. CANNAN:
Q. Well --
Okay.
And the person in the middle there, Kenneth Rudge, are you aware that he's serving approximately 30 years for violence and drug-related crimes?
MR. SAAVEDRA: Objection. You can answer.
THE WITNESS: It was a big takedown. But I don't remember who -- who specifically was arrested.
BY MR. CANNAN:
Q. Uh-huh.
A. And -- or how long they've been serving right now.
Q. And did you learn that it

Page 371

D. LOPEZ - CONFIDENTIAL

was a --
The second floor on 2416 Webster Avenue was a -- a stash house for YNR?
MR. SAAVEDRA: Objection. You can answer.
THE WITNESS: While my investigation was conducting?
BY MR. CANNAN:
Q. At any time.
A. Later, yes.
Q. Okay. But --
A. Later on.
Q. -- you didn't learn during your investigation?
A. Correct.
Q. And did you learn that Carlos Titan (phonetic) was also convicted as a -- for selling drugs and committing violence as a YNR member?
MR. SAAVEDRA: Objection. You can answer.
THE WITNESS: Later on, when the takedown happened, yes.

Page 372

D. LOPEZ - CONFIDENTIAL

BY MR. CANNAN:
Q. Uh-huh.
Your CI never told you about this drug gang?
MR. SAAVEDRA: Objection. You can answer.
THE WITNESS: The CI would mention that there was violence, but I will note it on my DD-5 even if he will men= -- he or she would mention it.
BY MR. CANNAN:
Q. Uh-huh. Okay.
I'll take these back.
Did you learn as part of your investigation that Sebastian Arbelaez had filed a CCR complete -- complaint against the police in the couple of weeks prior to the start of your investigation?
A. No, sir.
Q. You didn't learn that he complained police were using unnecess- -- excessive force on a person they had taken into custody in front of their building?

Page 373

D. LOPEZ - CONFIDENTIAL

MR. SAAVEDRA: Objection. You can answer.
THE WITNESS: No, sir, I didn't. Didn't know.
BY MR. CANNAN:
Q. Did any of your searches show you when people in that building at 2416 Webster Avenue called the police?
A. 911 calls.
Q. 911 calls?
A. Yes.
Q. Okay.
MR. CANNAN: Do you want to take a short break, kind of stretch your legs? Yeah.
THE VIDEOGRAPHER: Okay. We're going off the record at 6:18 p.m. This marks the end of Media Four.
(A brief recess was taken from 6:18 p.m. to 6:24 p.m.)
THE VIDEOGRAPHER: We're back on the record at 6:24 p.m. This marks the beginning of

94 (Pages 370 - 373)